# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

|  |  |  |
|---|---|---|
| AMERICAN STATES PREFERRED INSURANCE COMPANY, and AMERICAN STATES INSURANCE COMPNAY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07-0584-CV-W-NKL |
| TINA McKINLEY, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| THEODORE W. WHITE, JR., | ) ) | |
| Necessary Party. | ) ) | |

## ORDER

Before the Court is the Motion for Summary Judgment [Doc. # 54] of Plaintiffs American States Preferred Insurance Company and American States Insurance Company ("Plaintiffs"). Plaintiffs seek a declaration that they have no duty to indemnify Defendant Tina McKinley ("McKinley") for conspiracy claims made against her by Necessary Party Theodore W. White, Jr. ("White"). For the following reasons, the Court grants the motion.

## I.    Factual Background

### 1.    Underlying Action

In August 2008, in a separate action, a jury returned a verdict against McKinley and her co-defendant for conspiring to deprive White of a fair trial. (*See generally* Case No. 05-

203-CV-C-NKL).  Among other things, the Complaint in the underlying action alleges that White and McKinley were once married and, at some point prior to March 1998, that marriage began to fail.  According to that Complaint, McKinley's biological daughter and White's adopted daughter, Jami, accused White of sexually molesting her.  At the time, White and McKinley were still married.  White was arrested on molestation charges stemming from this accusation in April 1998.  White was tried three times based on these accusations, the first time in February 1999.

The Complaint in the underlying action also states that McKinley was engaged in an adulterous affair with one of the detectives assigned to investigate her daughter's accusations, but the affair was not disclosed to White until after he was convicted of sexual abuse.  Once the affair was discovered by White's criminal defense counsel, the Court of Appeals for the Western District of Missouri reversed his conviction, and White was eventually acquitted.

In the underlying action, the introductory jury instruction informed the jury that White "allege[d] that the defendants intentionally deprived him of his right to a fair trail as secured by the United States Constitution."  Jury Instruction 16, the verdict directing instruction in that case, informed the jury that it should find in favor of White if it found that McKinley took certain actions "in bad faith."[1]

---

[1] Jury Instruction 16,  provided:
You must find for Plaintiff Theodore White, Jr., and against Defendants Tina McKinley and Richard McKinley on Plaintiff's claim that they conspired to deprive him of his federal constitutional right to a fair trial if you believe:

> First, Defendants Tina McKinley and Richard McKinley reached an agreement or came to an understanding to either:
>
>> fail to disclose to the prosecutors evidence material to the Plaintiff's

The jury returned a verdict in favor of White and against McKinley. Judgment was entered against McKinley and her co-defendant in the amount of $14,000,000 on White's "claim that they conspired to deprive him of his federal constitutional right to a fair trial"; in addition,"The jury found in favor of [White] and against [McKinley] for punitive damages and assessed punitive damages against [McKinley] in the amount of $1,000,000."

McKinley demanded that Plaintiffs, under a homeowner's insurance policy in which she was a named insured, provide a defense and indemnify her for the claims brought against her in the underlying action. Plaintiffs denied and continue to deny that they owe McKinley any defense or indemnity in the underlying action, though they agreed to defend McKinley under a reservation of rights.

---

defense; or
cause the prosecutors not to disclose evidence material to the Plaintiff's defense; or
fail to preserve evidence material to the Plaintiff's defense;
and
Second, Defendants Tina McKinley and Richard McKinley took one or more of the actions described in paragraph First in bad faith;
Third, while the agreement or understanding was in effect, either Defendant Tina McKinley or Defendant Richard McKinley took one or more acts for the purpose of carrying out or carrying forward the agreement or understanding; and
Fourth, by reaching an agreement or coming to an understanding and taking one or more of the actions described in paragraph First, Defendants Tina McKinley and Richard McKinley proximately caused injury to the Plaintiff.
If any of the above elements has not been proved, then your verdict must be for Defendants Tina McKinley and Richard McKinley. . . .
(Def. Ex. C.)

3

2.      **Homeowner's Policies**

Plaintiffs issued three Missouri homeowner's policies to McKinley and White for three different residences they owned. Each policy provided homeowner's property and liability insurance to both of them, and includes relevant "Special Provisions" forms. Each policy was renewed, and some of the Special Provisions forms were revised upon renewal. The table below sets forth relevant information on each policy.

| Insured Property | Policy Numbers | Dates of Coverage | Special Provisions Forms |
|---|---|---|---|
| "Northgate Policy": pertaining to a residence on Northgate Crossing in Lee's Summit, Missouri | PH-24-05779-1 | 9/25-95 - 9/25/96 | SPECIAL PROVISIONS, HO-300MO |
| | PH-24-05779-2 | 9/25/96 - 9/25/97 | HOMEOWNERS XL SPECIAL FORM, HO-3XLMO |
| | PH-24-05779-3 | 9/25/97 - 9/25/98 | |
| | PH-24-05779-4 | 9/25/98 - 9/25/99 (cancelled for non-payment of premium 11/22/98) | HOMEOWNERS XL SPECIAL FORM, 3XLMO |
| "Onyx Policy": pertaining to a residence on Southeast Onyx in Lee's Summit, Missouri | PH-24-046470-1 | 7/1/94 - 7/1/95 | HOMEOWNERS XL SPECIAL FORM, HO-3XLMO, supplemented by SPECIAL PROVISIONS, HO-300MO |

5

| Insured Property | Policy Numbers | Dates of Coverage | Special Provisions Forms |
|---|---|---|---|
| | PH-24-046471-2 | 7/1/95 - 11/17/95 (cancelled at insured's request) | HOMEOWNERS XL SPECIAL FORM, 3XLMO, supplemented by SPECIAL PROVISIONS, HO-300MO |
| "Port Drive Policy": pertaining to a residence on NE Port Drive in Lee's Summit, Missouri | MH-24-128309-1 | 7/25/94 - 7/25/95 | HOMEOWNERS SPECIAL FORM, HO-3MO, supplemented by SPECIAL PROVISIONS, HO-300MO |
| | MH-24-128309-2 | 7/25/95 - 7/25/96 | |
| | MH-24-128309-3 | 7/25/96 - 7/25/97 | |
| | MH-24-128309-4 | 7/25/97 - 6/24/98 (cancelled mid-term) | |
| | MH-24-128309-5 | 7/25/98 - 7/25/99 (cancelled flat from inception) | |

As to each policy, the parties agree that the only potential coverage for liability in the underlying action appears in Coverage E - Personal Liability.

The parties point to two additional facts which are relevant to the Court's consideration of the policies' Personal Liability provisions. In a sworn declaration, McKinley states that she did not intend to cause "bodily injury" to White. Also, White did not live in the residence at Northgate Crossing after March 23, 1998.

Case 4:07-cv-00584-NKL   Document 65   Filed 04/28/09   Page 6 of 21

### 3.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment, arguing that the policies do not require them to indemnify McKinley for the judgment in the underlying action. Their motion turns on the meaning of the terms "occurrence," "insured," "bodily injury" and "personal injury" which are defined in each of the policies. Plaintiffs argue that they are not required to indemnify McKinley because: (1) there was no "occurrence" triggering coverage; (2) White's injuries did not arise during the policy periods; (3) White's injuries are not "bodily injury" or "personal injury" covered by the policies; and, (4) even if the policies provide coverage, that coverage is barred by two separate exclusions in the policies.

## II.    Discussion

### 1.    Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, a court must consider the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). "Summary judgment is frequently used in the context of insurance coverage questions, and the interpretation of an insurance policy is a question of law." *Buehne v. State Farm Mut. Auto. Ins. Co.*, 232 S.W.3d 603, 606 (Mo. Ct. App. 2007).

7

### 2. Insurance Contract Interpretation Standards

The parties agree that Missouri law controls this case. *See generally Langley v. Allstate Ins. Co.*, 995 F.2d 841, 844 (8th Cir. 1993) (stating that federal courts exercising diversity jurisdiction apply state law rules for construing insurance policies). Under Missouri law, "Where an insurance policy is unambiguous, it will be enforced as written absent a statute or public policy requiring coverage." *American Family Mut. Ins. Co. v. Turner*, 824 S.W.2d 19, 21 (Mo. Ct. App. 1991). This rule extends to language appearing in exclusion sections of insurance policies. *See Harrison v. MSA Mut. Ins. Co.*, 607 S.W.2d 137, 139 (Mo. banc 1980).

In determining whether the language of an insurance policy is ambiguous, the words will be given the meaning which a layperson purchasing the policy would ordinarily understand. *American Family*, 824 S.W.2d at 21. Ambiguity exists in an insurance policy if the language used in the policy is reasonably and fairly open to different constructions. *See Krombach v. MayFlower Ins. Co., Ltd.*, 785 S.W.2d 728, 731 (Mo. Ct. App. 1990). Policy language that is ambiguous "will [also] be interpreted in the manner that would ordinarily be understood by the lay person who bought and paid for the policy." *Stotts v. Progressive Classic Ins. Co.*, 118 S.W.3d 655 (Mo. Ct. App. 2003) (citation omitted). Because an insurance policy is designed to furnish protection, an ambiguous policy will be interpreted to afford coverage and not to defeat coverage. *Krombach*, 785 S.W.2d at 731. However, the Court cannot create an ambiguity in order to distort the language of an unambiguous policy. *Id.*

8

Furthermore, an insurance policy must be construed as a whole, not by viewing portions of the policy in isolation. *Id.* The Court cannot read the policy in such a way which would render a portion of the policy illusory. *Id.*

**3.      Coverage**

Plaintiffs argue that the policies do not provide coverage for McKinley's conspiracy. In relevant part, each policy defines the circumstances under which it will provide personal liability coverage as follows:

> SECTION II - LIABILITY
> COVERAGE E - Personal Liability
> If a claim is made or a suit is brought against an "insured" for damages because of "personal injury" . . . caused by an "occurrence" to which this coverage applies, we will:
> 1.      pay up to our limit of liability for the damages for which the "insured" is legally liable; and
> 2.      provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

The parties agree that McKinley was an "insured" and that the underlying action was brought against her. Thus, to establish coverage, it must be shown that the damages awarded in the underlying action were for "personal injury" and caused by an "occurrence."

**a.      Occurrence**

Plaintiffs first argue that the underlying action did not seek damages caused by an "occurrence" within the meaning of the policies. Each policy defines "occurrence" in relevant part as follows:

9

"occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in [personal injury] . . . .

Thus, in order to be considered an "occurrence," an event must be both an "accident" and must cause (for purposes of this case) a "personal injury."

The Court must determine whether McKinley's conspiracy to deprive White of his Constitutional right to a fair trial was an "accident." The policies do not define the term "accident." However, Missouri courts have provided a definition, finding that "accident" should be given its ordinary meaning:

an event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. . . . [O]ften, an undesigned and unforeseen occurrence an afflictive or unfortunate character; a mishap resulting in injury to a person . . . ; a casualty.

*J.E. Jones Constr. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 341-42 (8th Cir. 2007) (citation to Missouri appellate decision omitted) (rejecting the argument that breach of fiduciary duty was an "accident" because no intent to injure had been shown); *Wood v. Safeco Ins. Co. of America*, 980 S.W.2d 43, 49-50 (Mo. Ct. App. 1998) (reading "accident" in a definition of "occurrence" identical to that in this case as encompassing negligent actions which were not intentionally inflicted).

Plaintiffs argue that the jury in the underlying action found McKinley liable for willful and intentional – not accidental – conduct. The jury found that McKinley violated 42 U.S.C. § 1983 by conspiring to deprive White of his Constitutional right to a fair trial. A private actor may only be held liable under § 1983 for conspiracy if there is a showing

that the actor "willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy." *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005) (citation omitted). "Willful" conduct is that "[p]roceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional; purposeful; not accidentally or involuntary." *Black's Law Dictionary* 1599 (6th ed. 1990).

Incorporating this element of willfulness, the verdict-directing jury instruction in the underlying action stated that the jury could find McKinley liable only if it found that she acted in "bad faith." Though the instruction did not define the term, a finding of "bad faith" equates to a finding of "wrongful motive, actual intention to inflict harm or intentional wrongdoing of an act." *See Smith v. Wade*, 461 U.S. 30, 60 (1983) (discussing such motives in analysis of punitive damages issues in § 1983 case); *Ivory v. City of Minneapolis*, No. Civ. 02-4364JRTFLN, 2004 WL 1765460 (D. Minn. Aug. 4, 2004) (indicating that "bad faith" in the context of a § 1983 charge "means intentionally doing a wrongful act without legal justification of excuse, or a willful violation of a known right") (citation omitted); *Black's Law Dictionary* 139 (6th ed. 1990) (defining "bad faith" as, *inter alia*, "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . [I]t implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will"). Under Missouri law, where "accident" is defined as "undesigned," "unforeseen" and a "mishap," "willful" acts and those taken in "bad faith" are not accidental.

11

Therefore, McKinley's conspiracy cannot be considered accidental. The jury in the underlying action found McKinley liable for conspiring to deprive White of his Constitutional right to a fair trial in violation of § 1983. In so doing, it necessarily found that she acted willfully, and in bad faith – i.e., not accidentally.

However, McKinley and White argue that the term "occurrence" is ambiguous – and thus must be construed against Plaintiffs – because it is defined as an "accident" which causes "personal injury." They note that "personal injury" is defined in the policies as "a. 'bodily injury'; and b. injury arising out of one or more of the following offenses: (1) false arrest, detention or imprisonment, or malicious prosecution; (2) libel, slander or defamation of character; or (3) invasion of privacy, wrongful eviction or wrongful entry." McKinley argues, "The 'accident' component of the definition of 'occurrence' is contrary to the intentional component of some of the offenses which the policy recognizes as those triggering 'personal injury.'" ([Doc. # 61, McKinley Resp. at 7.) In other words, McKinley and White contend that injuries resulting from the specific torts listed in the "personal injury" definition can never be "accidents," as those are intentional torts; therefore, the policies' definition of "occurrence" is ambiguous.

Several Missouri cases provide insight, but no direct answer, on the issue of whether the definition of "occurrence" is ambiguous because "personal injury" includes injuries arising from certain, non-accidental torts. In *Todd v. Missouri United Schools Insurance Council*, 223 S.W.3d 156 (Mo. 2007), a school district's policy stated that an "occurrence" was "an accident . . . that causes Bodily Injury, Personal Injury or Property Damage neither

Case 4:07-cv-00584-NKL   Document 65   Filed 04/28/09   Page 12 of 21

expected nor intended by the Covered Party", *id.* at 161. The policy also provided: "Humiliation, defamation or other Personal Injury that is continuous or repeated shall be considered a single Occurrence"; "Incidents of sexual assault, sexual or physical abuse or Sexual Molestation against more than one victim, regardless of the number of incidents, perpetrators or injuries ... shall be treated as a single Occurrence"; and "Personal Injury means injury unintended by the Insured that a person may suffer to his reputation, character or feelings resulting from ... humiliation." *Id.* at 161-62. A judgment was entered against one teacher for assaulting another; and the injured teacher sought to recover under the school district's insurance policy, alleging the policy provided coverage for the assault. *Id.* at 159-60. The injured teacher argued that the intentional element of torts listed in the policy's language regarding "personal injury" rendered the definition of "occurrence" ambiguous. *Id.* at 164.

However, the insurer in *Todd* showed that the policy provided two types of coverage: coverage for the conduct of individual employees; and coverage for the district for the acts of its employees. *Id.* The *Todd* court found that the intentional tort language in the discussion of "personal injury" referred to coverage provided to the school district for its vicarious liability for the intentional acts of the employees, rather than to the coverage provided to the employees themselves. *Id.* Because there were two types of coverage, the *Todd* court found that including intentional torts in the definition of "personal injury" was not ambiguous: the school district need not have intended injuries resulting from intentional acts of its employees and, thus, such injuries could be "accidental" from the

13

perspective of the school district.  *Id.*   Thus, the *Todd* court found that including intentional torts in the "personal injury" language did not render the definition of "occurrence" ambiguous.  *Id.*   However, *Todd* is not controlling because, the parties in this case do not indicate that there was any type of coverage under which the insureds could have been vicariously liable for the intentional torts of another.

In ruling that the term "occurrence" was not ambiguous, the *Todd* court narrowed the holding of another case which considered whether reference to intentional torts in a definition of "personal injury" rendered a definition of "occurrence" ambiguous, *Missouri Property & Casualty Insurance Guaranty Association v. Petrolite Corp.*, 918 S.W.2d 869 (Mo. Ct. App. 1996).  *See Todd*, 223 S.W.3d at 164 (refusing to extend *Petrolite* to situations in which policies include two separate coverages).  The *Petrolite* court considered whether a definition of "occurrence" extended to intentional age discrimination.  *Petrolite*, 918 S.W.2d at 871-72.  There, the policy defined "occurrence" as an accident resulting in, among other things, "personal injury" neither expected nor intended by the insured.  *Id.*   The policy defined "personal injury" to include certain intentional torts,  as well as "age discrimination . . . not committed by or in the direction of the insured."  *Id.*   The insurer argued that it was not obligated to cover intentional age discrimination under the "personal injury" definition.  *Id.* at 872-73.  The *Petrolite* court found, "Reading the 'personal injury' definition and the 'occurrence' definition together, the policy apparently provides coverage for 'unintentional intentional torts' not committed by or at the direction of the insured"; the *Petrolite* court found this to be "complete nonsense."  *Id.* at 873.  Where the definition of

14

"personal injury" included a number of intentional torts – including discrimination –, the *Petrolite* court found that intentional age discrimination was a covered "occurrence" despite the requirement that an "occurrence" be accidental. *Id.* However, *Petrolite* is not controlling, as the definition of "personal injury" in this case does not include the specific tort – conspiracy to deprive Constitutional rights – for which the insured was found liable.

Still, this case is more like *Petrolite* than *Todd*. The definition of "personal injury" does not specifically name the tort for which McKinley is liable; however it does list several similar intentional torts: false arrest, detention, imprisonment, malicious prosecution, libel, slander, and defamation of character. A layperson of average understanding purchasing a homeowner's policy could reasonably equate "false arrest" and "malicious prosecution" with the conduct for which McKinley is liable – conspiring in bad faith to deprive White of a fair trial. *Foremost Signature Ins. Co. v. Montgomery*, 266 S.W.3d 868, 871 (Mo. App. Ct. 2008) (stating that courts interpreting policy language apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance" and "interpret the policy language consistent with the reasonable expectations, objectives, and intent of the parties," resolving ambiguities in favor of the insured). The definition of "occurrence" in the policies is ambiguous. Resolving this ambiguity in favor of the insured, the Court cannot find as a matter of law that McKinley's conspiracy is not an "occurrence" because she acted intentionally.

15

### a.    Policy Period

Plaintiffs next argue that, even if McKinley's conspiracy constitutes an occurrence, they are not liable because White's injuries did not occur within the policy period, as required by the policies' definition of "occurrence."  The Northgate Policy was in effect from September 25, 1995 through November 22, 1998.  The Onyx Policy was in effect from July 1, 1994 through November 17, 1995.  The Port Drive Policy was in effect from July 25, 1994 through June 24, 1998; another Port Drive Policy was in effect from July 25, 1998 to July 25, 1999, but "cancelled flat from inception," which Plaintiffs state means the policy was never in effect.  The policies do not indicate how to determine whether White's injuries occurred "during the policy period."  Without citation, Plaintiffs contend that White was not injured until the first criminal trial began in February 1999.  Because there was no policy in effect at that time, they argue that coverage was not triggered.

Under Missouri law, where an insurance policy restricts insurance coverage to occurrences during a policy period, the policy limits coverage to "injuries arising during the policy period and . . . exclude[s] from coverage injuries which occur subsequent to that period, even though the injuries may have been caused by acts done while the policy was in effect." *Nationwide Ins. Co. v. Central Mo. Elec. Coop., Inc.*, 278 F.3d 742, 747 (8th Cir. 2001) (citations to Missouri appellate case law omitted); *Shaver v. Insurance Co. of N. America*, 817 S.W.2d 654, 658 (Mo. Ct. App. 1991) (stating that the time of an occurrence within the meaning of an indemnity policy is measured at the time when the complaining party is actually damaged, rather than the time of the wrongful conduct).

16

White argues that "the trigger point for the injuries White sustained occurred when, according to his complaint, he was wrongfully *charged* with the crime of child molestation at the hands of . . . McKinley and her co-conspirators . . . in early April of 1998." (White Sugg. Opp. [Doc. # 62] at 18 (emphasis original).) White cites *Hampton v. Carter Enterprises, Inc.*, 238 S.W.3d 170, 176 (Mo. App. Ct. 2007). The *Hampton* court considered the "triggering date" for purposes of insurance coverage on a malicious prosecution claim. *Id.* at 176-77. The *Hampton* court noted that the offense of malicious prosecution is committed with the institution of the underlying prosecution – the point at which the judicial process is maliciously invoked without probable cause, causing the victim's injury. *Id.* at 177. While noting the continuing nature of conduct constituting malicious prosecution, the *Hampton* court concluded that the "triggering date for coverage should be limited to the date on which the party first continued the malicious prosecution." *Id.*

Unlike the plaintiff in *Hampton*, White chose not to proceed on his malicious prosecution claim. But no Missouri case addresses a "triggering date" for coverage on a claim for conspiracy to deprive of a fair trial, and Plaintiffs offer no alternative case law. The continuing conduct required in conspiring to deprive someone of the right to a fair trial poses a risk of injury similar to that posed by the continuing conduct of malicious prosecution; thus, the Court finds *Hampton* persuasive. Applying *Hampton*, the triggering date for coverage is that on which McKinley first conspired to deprive White of a fair trial.

17

The Court cannot determine this date from the record before it. The Court cannot find as a matter of law that White's injuries occurred outside the policy period.

### b. "Personal Injury"

Plaintiffs argue that White's injuries do not qualify as "personal injuries" for which the policies provide coverage. The policies define "personal injury" as: "a. 'bodily injury'; and b. injury arising out of one of more" of certain enumerated torts: false arrest, detention, imprisonment, malicious prosecution, libel, slander, defamation of character, invasion of privacy, wrongful conviction or wrongful entry. Though the policies include slightly different definitions of "bodily injury," the relevant portions of those definitions are "bodily harm" or "physical injury." Plaintiffs argue that the Judgment in the underlying action clarifies that the jury awarded damages only for injuries resulting from conspiracy, not one of the enumerated torts; thus, say Plaintiffs, White did not suffer the requisite injury.

White concedes that he abandoned his claims for false arrest and malicious prosecution, two of the torts enumerated in the policies' definition of "personal injury." However, White argues that the jury need not have awarded damages on a *claim* arising from one of the enumerated torts, but only for *injuries* which arose from such torts. The Court, however, need not resolve this difficult issue because it is clear that at least one policy exclusion applies even if there is coverage.

### 4. Exclusions

Case 4:07-cv-00584-NKL   Document 65   Filed 04/28/09   Page 18 of 21

### a.    Insured's Personal Injury Exclusion[2]

Assuming that coverage extends to McKinley's conspiracy because it is an "occurrence," Plaintiffs argue that such coverage is barred by an exclusion in each policy concerning personal injuries to insureds.  The policies provide the following exclusion:

> 2.    Coverage E – Personal Liability, does not apply to:

> g.    . . . "personal injury" to you . . . or an 'insured' within the meaning of part a. or b. of 'insured' as defined.

Thus, the exclusion bars coverage for personal injury to either "you" or "insureds."  The definitions section of each policy states:

> In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. . .

> 3.    "insured" means you and residents of your household who are:
> a.    your relatives; . . .

These definitions clarify that the insured's personal injury exclusion applies to White, as he falls within the definitions of both "you" and "insured."  McKinley and White concede that White was a named insured under each policy for all relevant policy periods; because "you" is defined as "named insured," the exclusion reference to "you" also applies to White.  Because the exclusion bars coverage for personal injuries to "you" or an "insured," the exclusion applies to White.  There is no need to even consider whether the exclusion also applies because White was the spouse of an insured.

---

[2]  Because the Court finds that this exclusion applies, it does not address the other exclusion raised by Plaintiff.

In his response brief, White argues that other portions of the definition of "insured" are ambiguous. That language does not concern the named insureds or create an ambiguity with regard to whether White was an "insured" under the policy. It does not create any ambiguity as to whether the insured's personal injury exclusion applies to White.

White also argues that an ambiguity is created by a provision in one of the policies concerning the death of an insured. He states that the death provision creates an ambiguity with regard to whether the insured's personal injury exclusion applies to him. The death provision states, "*If any person named in the declarations . . . dies*: . . . 'insured' includes: . . . any member of your household who is an 'insured' at the time of your death, but only while a resident of the 'residence premises.'" (Emphasis added.) By it's plain language, the provision would only apply if White or McKinley died. No reasonable reading of the provision creates a doubt as to whether the insured's personal injury exclusion applies to White.

"Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies" and will be enforced where they are clear and unambiguous. *Todd v. Missouri United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007) (upholding intentional conduct exclusion). Here, the insured's personal injury exclusion relevant to this case is not ambiguous. Although, as discussed above, the policies may be read to provide coverage for McKinley's conspiracy, the insured's personal injury exclusion clearly limits that coverage as to White's injuries. The Court must give effect to that exclusion. *See generally St. Paul Fire & Marine Ins. Co. v. Warren*, 87 F. Supp. 2d 904, 911 (E.D. Mo. 1999) (enforcing,

20

under Missouri law, provision in homeowner's policy excluding coverage for personal injuries to members of household). As a matter of law, the exclusion operates to bar coverage.

## III. Conclusion

Accordingly, it is hereby ORDERED that Plaintiffs' Motion for Summary Judgment [Doc. # 54] is GRANTED.

<div style="margin-left:auto;">

Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

</div>

Dated: April 28, 2009
Jefferson City, Missouri

Case 4:07-cv-00584-NKL   Document 65   Filed 04/28/09   Page 21 of 21